UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROBERT WILSON, o.b.o.
L.W., a Minor,

        Plaintiff,                              Hon. Janet T. Neff

v.                                           Case No. 1:09 CV 46

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/


## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security that Plaintiff is not entitled to Supplemental Security Income under Title XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

**STANDARD OF REVIEW**

The Court's jurisdiction is limited to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making his decision, and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). The

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## **PROCEDURAL POSTURE**

Plaintiff was born on August 5, 1991. (Tr. 79). On September 19, 2005, Plaintiff submitted an application for disability benefits, asserting that he has been disabled since birth, due to Oppositional Defiant Disorder (ODD), Attention Deficit Hyperactivity Disorder (ADHD), mood disorder, and conduct disorder. (Tr. 79-81, 91). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 31-63). On March 11, 2008, Plaintiff appeared before ALJ William Reamon, with testimony being offered by Plaintiff, Plaintiff's father, and medical expert, Dr. Thomas Ippel. (Tr. 443-78). In a written decision dated June 11, 2008, the ALJ determined that Plaintiff was not disabled as defined by the Act. (Tr. 17-30). The Appeals Council declined to review this determination, rendering it the Commissioner's final decision in the matter. (Tr. 5-8). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g).


## **MEDICAL BACKGROUND**

On April 6, 2004, psychologist Jessica Duguid met with Plaintiff. (Tr. 135-47). Duguid reported that Plaintiff had recently been discharged from the Allegan County Youth Home "due to domestic violence and incorrigibility charges." (Tr. 135). Plaintiff's dad reported that he was "concerned about [Plaintiff] dealing with anger and frustration by becoming violent." (Tr. 135).

Plaintiff's dad reported that Plaintiff lacks respect for authority figures, experiences difficulty managing his anger, steals, and lies. (Tr. 135). Plaintiff's father also reported that Plaintiff had recently "developed an obsession with knives." (Tr. 140). Duguid observed that Plaintiff "has had ongoing problems at school" and "usually earns mostly failing grades." (Tr. 142). She further noted that Plaintiff has "had multiple suspensions for behavior problems at school, in spite of Spec[ial] Ed[ucation services]." (Tr. 142). Plaintiff's dad reported that Plaintiff responded to "limit setting" by "hitting" him and "not returning home until bedtime." (Tr. 142). Plaintiff's father reported that Plaintiff "has been stealing items and money for years." (Tr. 144). Plaintiff's father reported that Plaintiff has previously taken certain medications, only some of which produced a positive response. (Tr. 144). In this respect, Plaintiff's father reported that certain medications had actually increased Plaintiff's anger. (Tr. 144). Plaintiff was diagnosed with ODD and ADHD. (Tr. 145). His GAF score was rated as 50.[1] (Tr. 145).

On April 9, 2004, Plaintiff was returned to "juvenile detention." (Tr. 150, 156). Treatment notes dated April 22, 2004, indicate that Plaintiff was making "no progress" in detention. (Tr. 159). Treatment notes dated April 27, 2004, indicate that Plaintiff was "locked down in [his] room and was feeling "quite depressed and hopeless." (Tr. 158). Treatment notes dated May 25, 2004, indicate that Plaintiff "continues to argue with [his] dad" and had been involved in "three fights at school, but continues to place all blame on the other party." (Tr. 173).

Treatment notes dated June 1, 2004, indicate that Plaintiff's medication regimen was again modified. (Tr. 172). Jessica Duguid also reported that Plaintiff "continues to do well in

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

school," but "fails to take responsibility for his own actions [and] refuses to implement anger management techniques suggested by therapist [and] father." (Tr. 172). On June 7, 2004, Plaintiff reported that "things have gotten better" since his most recent medication modification. (Tr. 171).

On June 28, 2004, Jessica Duguid reported that Plaintiff "has made some progress" toward the goal of staying out of trouble, but "has difficulty maintaining progress." (Tr. 179). Duguid also reported that Plaintiff "made minimal progress while lodged at the Youth Home on two separate occasions." (Tr. 179). Plaintiff indicated that he wants "to obey rules," but Duguid observed that Plaintiff "has difficulty transferring skills from therapy to his home environment." (Tr. 179). Duguid reported that Plaintiff "did make some progress in his academic environment before school let out for summer," but "had minimal behavioral discipline upon his return to school." (Tr. 179). Duguid reported that Plaintiff "has made intermittent progress" toward the goal of stabilizing his moods." (Tr. 179).

Treatment notes dated July 26, 2004, indicate that Plaintiff is "doing well on [current] med[ication] regimen." (Tr. 191). On August 16, 2004, Plaintiff's dad reported that Plaintiff was experiencing "increasing amounts of anger, lying, and stealing." (Tr. 189). On August 30, 2004, Jessica Duguid reported that Plaintiff "continues to struggle at home." (Tr. 187). On September 13, 2004, Jessica Duguid reported that Plaintiff "has made very little progress" at home. (Tr. 186).

Treatment notes dated September 20, 2004, indicate that Plaintiff was "back [in] detention" for theft. (Tr. 185). Treatment notes dated October 4, 2004, indicate that Plaintiff "has been restricted to his room at [Allegan County Youth Home] due to his inability to appropriately follow rules." (Tr. 299).

Treatment notes dated November 1, 2004, indicate that Plaintiff "has returned home." (Tr. 297). On November 29, 2004, Jessica Duguid reported that Plaintiff "continues to have the same problems at home as normal" including "pushing limits and stealing from Dad." (Tr. 296).

On January 6, 2005, Plaintiff was placed in the Cheever Treatment Center, following several theft charges. (Tr. 199-200). Prior to this placement, Plaintiff's "behavior in school was disruptive and he was failing most of his classes." (Tr. 199). Plaintiff also "had problems with impulse control and maintaining attention." (Tr. 199). Upon placement at Cheever, Plaintiff was placed in special education classes. (Tr. 199). Plaintiff's special education teacher subsequently reported that Plaintiff "doesn't work as hard as other students and demonstrates poorer behavior than other students." (Tr. 199). Plaintiff also exhibited an "inability to follow simple classroom expectations" and struggled "to get back on task." (Tr. 199-200).

On January 31, 2005, Jessica Duguid reported that Plaintiff "continues to struggle [with] requests from adults." (Tr. 289). She also observed that Plaintiff is "currently failing two classes in the school program." (Tr. 289). On February 7, 2005, Jessica Duguid reported that Plaintiff was "continuing to have difficulty adhering to program rules at [Cheever]." (Tr. 286). She also noted that Plaintiff was again caught stealing. (Tr. 288).

On February 14, 2005, Plaintiff was examined by Dr. Nan Beth Alt. (Tr. 285). The doctor observed that while Plaintiff was taking medication he "still has behavioral issues of not following the rules and stealing." (Tr. 285). Following a March 14, 2005 examination, Dr. Alt reported that Plaintiff "is very much improved" and "is making progress." (Tr. 284). The doctor observed that Plaintiff's "judgment and insight is improving," "he has decreased impulsivity," and "he is processing better, is calmer." (Tr. 284).

Treatment notes dated March 28, 2005, indicate that Plaintiff was again caught stealing. (Tr. 283). Jessica Duguid observed that "even though [Plaintiff is] in a fairly contained environment, he continues to experience difficulties with lying, stealing, and age-inappropriate behavior." (Tr. 276). It was also reported that Plaintiff had recently experienced an adverse reaction to certain of his medications. (Tr. 281). Specifically, it was reported that Plaintiff's medications adversely affected his attitude. (Tr. 281).

Treatment notes dated April 4, 2005, indicate that Plaintiff had exhibited "behavior improvement" and "continues to take meds as prescribed." (Tr. 246). Treatment notes dated April 18, 2005, indicate that Plaintiff was caught stealing again. (Tr. 252). Treatment notes dated April 25, 2005, indicate that Plaintiff was "psychiatrically stable," but was still exhibiting "behavioral issues." (Tr. 250).

On June 24, 2005, Plaintiff was examined at the Southwest Michigan Children's Trauma Assessment Center. (Tr. 193-209). The results of an educational readiness examination revealed that Plaintiff experienced a "major problem" in the following areas: (1) graphomotor function; (2) receptive language; (3) expressive language; (4) memory; (5) attention; and (6) strategy use. (Tr. 194). With respect to Plaintiff's cognitive and academic abilities, the examiners reported:

> Although his intellectual capacity falls within the average range, [Plaintiff's] developmental delays in some domains interfere with academic success. As he struggles with auditory processing, frustration from not understanding instructions fuels inattention and exacerbates problems with behavioral control. Presenting instructions visually may decrease the intensity of this cycle.

(Tr. 199-200).

With respect to Plaintiff's social and family functioning, the examiners reported:

[Plaintiff] has a history of theft charges. He has been in trouble for stealing since placement at the Cheever Center. He steals small things and becomes angry when confronted. He will not accept responsibility for his actions when he is first confronted, but will eventually confess. He appears remorseful when he finally admits what he did and attempts to stop himself, but he continues to steal. He has poor hygiene and is often picked on by other kids at Cheever. Other children attempt to get him in trouble because he has a history of stealing. He has attention problems and is often walking around and fidgeting. Although it is reported that he has struck out at his father in anger, there have been no outbursts at Cheever. Staff at Cheever report that [Plaintiff] believes his father is controlling. His father does not allow [Plaintiff's] mother to have contact with him. Staff at Cheever describe [Plaintiff] as an upbeat child with a good personality. He gets along with other kids until he steals from them.

(Tr. 200-01).

The examiners also noted that Plaintiff suffered from "clinically significant levels of hyperactivity/impulsivity and inattention in both the home and school settings." (Tr. 202). It was further observed that Plaintiff's "inattentive behavior in the home environment is at the maximum level of clinical significance." (Tr. 202).

The examiners also reported that Plaintiff scored "high" on the alexithymia scale. (Tr. 204). Alexithymia refers to the "inability to identify emotions or lack of awareness of emotions." (Tr. 204). The examiners observed that "[t]he presence of alexithymia is of concern because it is hypothesized that if a person has alexithymia and cannot process his/her own feelings, he or she is likely to have somatic symptoms, have difficulty feeling empathy for others, and have increased acting out behaviors." (Tr. 204).

With respect to Plaintiff's emotional and behavioral functioning, the examiners identified Plaintiff's strengths as: (1) can be pleasant and upbeat; (2) ability to feel remorse; and (3) positive regard for father and sister. (Tr. 205). The examiners identified the following areas as

"concerns" in this regard: (1) aggression; (2) impulse control; (3) stealing and other rule breaking behaviors; (4) hyperactivity/inattention; (5) insecure attachment; (6) alexithymia; (7) depression; and (8) unresolved grief toward mother. (Tr. 205). The examiners also observed that Plaintiff "has a charm and a likeable personality with adults," but also noted that Plaintiff's "charm is often ingenuous because it is how he has learned to survive." (Tr. 208). It was further observed that Plaintiff "lacks an awareness of what others feel" which acts as "a shield that protects him from understanding how his stealing impacts others." (Tr. 208).

The examiners concluded that "features for fetal alcohol exposure are mildly present. . .indicating that [Plaintiff] does not meet the criteria for Fetal Alcohol Spectrum Disorder." (Tr. 206). Plaintiff was instead diagnosed with static encephalopathy[2] and ADHD. (Tr. 208).

On July 8, 2005, Terri Sharrar, a caseworker/classroom assistant who worked with Plaintiff 32 hours weekly, completed an evaluation of Plaintiff's condition. (Tr. 227-31, 236-39). Sharrar reported that Plaintiff "is very impulsive" and "has little to no self control over lying or taking things that do not belong to him." (Tr. 228). Sharrar further reported that "[e]ven with the increased amount of support and security 24 hours a day [in residential treatment, Plaintiff] continues to steal and lie." (Tr. 228). Sharrar observed that while Plaintiff had been taking various medications for several years, certain of these medications actually increased Plaintiff's level of violence and anger. (Tr. 229). With respect to Plaintiff's classroom performance, Sharrar reported that Plaintiff exhibits an "inability to follow simple classroom expectations - and when redirected struggles to get on task." (Tr. 237).

---

[2] Static encephalopathy is a degenerative disease of the brain in which the degeneration at issue has slowed or ceased. *See Zeller v. Secretary of Health and Human Services*, 2008 WL 3845155 at *2 n.3 (Fed. Cl., July 30, 2008) (citing Dorland's Illustrated Medical Dictionary (30th ed. 2003)).

Treatment notes dated July 18, 2005, indicate that Plaintiff "has been getting into more trouble [at Cheever], resulting in room isolation." (Tr. 243). Treatment notes dated August 23, 2005, indicate that Plaintiff was returned to detention after being caught stealing from a staff member. (Tr. 242).

On November 14, 2005, Jessica Duguid reported that Plaintiff "has been having difficulty [at the Cheever] program." (Tr. 386). Duguid noted that Plaintiff was placed "in isolation and asked to leave the classroom due to inappropriate behavior." (Tr. 386).

Treatment notes dated January 3, 2006, indicate that Plaintiff "continues to have mixed progress," as he experiences "lengthy periods of appropriate behavior w[ith] occasional problems that result in a return to detention." (Tr. 363).

On January 23, 2006, Dr. Alt reported that Plaintiff was psychiatrically "stable" and "doing fairly well" on his current medication regimen. (Tr. 372). Treatment notes dated February 21, 2006, indicate that Plaintiff had recently stolen cigarettes and prescription medication from his father. (Tr. 385).

Treatment notes dated March 28, 2006, indicate that Plaintiff is "able to complete his academic work, but he has difficulty implementing appropriate behavioral controls." (Tr. 339). It was reported that Plaintiff "refuses to follow the rules set forth by authority figures, and he often blames others for his misbehavior." (Tr. 339). It was further observed that Plaintiff "indicates a desire to have more freedom, but his behavior indicates that he performs much better within a highly structured and controlled environment." (Tr. 339). On March 29, 2006, a court ordered Plaintiff to be placed in detention due to poor behavior and failure to comply with the terms of his probation. (Tr. 394).

On May 22, 2006, Plaintiff was examined by Dr. Alt. (Tr. 371). The doctor reported that Plaintiff was "doing better" and "making progress," but also noted that Plaintiff was recently placed in detention at school after exhibiting "defiance." (Tr. 371).

On June 20, 2006, Jessica Duguid authored a letter regarding her treatment of Plaintiff. (Tr. 314-15). Duguid reported that Plaintiff "has been able to implement some changes in his functioning, but overall, progress remains slow and limited." (Tr. 314). Duguid continued:

> At first glance, [Plaintiff] presents as intelligent, articulate, and at times, a rather insightful young man. However, he demonstrates a minimal ability to implement the skills and messages he conveys to others. His lack of integration often leads to [Plaintiff] regressing to behavior and coping skills that have been addressed in a therapeutic setting for the past two years. Compared to his average age peers, [Plaintiff] lags significantly in emotional maturation. The difficulties continue to be addressed in therapy, but as previously mentioned, progress is mixed. At times, he appears to make progress, but he's unable to maintain the perceived progress for extended periods of time.
>
> Given [Plaintiff's] diagnosis of Attention Deficit/Hyperactivity Disorder and Static Encephalopathy, I do not anticipate any significant changes at this point in [Plaintiff's] development.

(Tr. 314).

On July 5, 2006, Jessica Duguid reported that Plaintiff "has made some improvements, but still requires constant monitoring." (Tr. 361). Duguid also reported that Plaintiff has "developed a more [positive] relationship w[ith his] family and authority figures; however, he continues to struggle at times." (Tr. 361).

On August 21, 2006, Plaintiff was examined by Dr. Alt. (Tr. 370). Plaintiff's father reported that "when he forgets to give [Plaintiff] a pill, he can notice a difference in the way [Plaintiff] behaves." (Tr. 370). The doctor rated Plaintiff's GAF score as 40.[3] (Tr. 370).

Plaintiff was released from the Cheever Center on December 5, 2006. (Tr. 369). Contemporaneous treatment notes reveal that Plaintiff "has been doing well with no attention deficit hyperactivity disorder symptoms, mood symptoms or behavioral problems." (Tr. 369).

On April 9, 2007, Jessica Duguid reported that soon after being released from the Cheever Center, Plaintiff "regressed to old habits of fighting/arguing w[ith] authority figures, refusing to comply w[ith] rules, and minimal academic achievement." (Tr. 352). As a result, Plaintiff was "returned to the Youth Home several times." (Tr. 352). Duguid also noted that Plaintiff "is experiencing a lot of behavioral difficulties at school." (Tr. 354). She further reported that Plaintiff had recently had his medication regimen modified without any apparent effect. (Tr. 355).

Treatment notes dated May 9, 2007, indicate that Plaintiff was recently placed in a "detention center" after bringing drugs and cigarettes to school. (Tr. 367). It was observed that Plaintiff "has been showing an increase in his maladaptive behavior and conduct problems." (Tr. 367). Treatment notes dated June 20, 2007, indicate that Plaintiff is "doing acceptably well with no significant behavioral problems or mood symptoms." (Tr. 366). Plaintiff reported that the recent modification to his medication regimen "is helping him significantly in controlling his ADHD symptoms." (Tr. 366).

---

[3] A GAF score of 40 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

Treatment notes dated July 2, 2007, indicate that Plaintiff "continues to sneak out of the house [and] steal [money] from his Dad." (Tr. 393). On July 5, 2007, Jessica Duguid reported that Plaintiff "has made some improvements, but still requires constant monitoring." (Tr. 361). Duguid also noted that Plaintiff has "developed a more [positive] relationship w[ith] family and authority figures; however, he continues to struggle at times." (Tr. 361).

Treatment notes dated August 8, 2007, indicate that Plaintiff was charged with incorrigibility, domestic violence, and being a runaway. (Tr. 391). Treatment notes dated September 12, 2007, indicate that Plaintiff "has been having increased behavioral problems and legal issues." (Tr. 365).

On September 23, 2007, Terri Sharrar authored a letter regarding her experiences with Plaintiff. (Tr. 316-17). Sharrar reported:

> As it would appear to anyone, [Plaintiff] is a normal 16 year old young man in good physical health. When you get to know [Plaintiff] and understand him you will begin to realize that [Plaintiff] has some deep mental issues.
>
> [Plaintiff] was placed in the Cheever Treatment Center on January 6, 2005. For the typical resident, treatment takes an average of 10 months. [Plaintiff] on the other hand struggled through the program for 23 months. [Plaintiff] has had every type of resource available in Allegan County. He has had diversion, probation, mental health, a mentor, aftercare services, Wraparound, detention, and treatment at Cheever. He has been with community mental health for almost four years seeing Ms. Jessica Duguid. This therapy has been slow going. Once placed in Cheever, [Plaintiff's] treatment team noticed that [Plaintiff] was different than other delinquents. He genuinely was remorseful and genuinely did not intend to cause harm to his victims from whom he had stolen from. [Plaintiff's] impulsivity was holding him back from having a normal teenage life. [Plaintiff] constantly had to be supervised in order for him to make effective decisions. He was not safe left unsupervised. He would, without any doubt steal something, be where he was not suppose to be, or be doing something he was not suppose to be doing.

13

(Tr. 316).

Sharrar further observed:

> [Plaintiff] will not grow out of his diagnosis; it will be with him the rest of his life. It is my professional opinion that [Plaintiff] will need some type of constant supervision in order to make effective decisions. This would need to be some type of adult foster care or in-home supervision.

(Tr. 317).

On October 18, 2007, Jessica Duguid completed a report concerning Plaintiff's condition. (Tr. 402-14). Duguid reported that since being released from probation in July 2007, Plaintiff "has had an increase in psychiatric/behavioral instability." (Tr. 402). Duguid observed that during this time, Plaintiff "has become increasingly defiant. . .and there have been numerous incidents of police becoming involved and filing petitions against [Plaintiff]." (Tr. 402). With respect to Plaintiff's performance at school, Duguid reported that Plaintiff was presently participating in three special education classes in which he was earning "2 failing grades and one D." (Tr. 403). She reported that Plaintiff refuses to comply with his teachers' instructions and aggravates his peers during class." (Tr. 403).

On the subject of Plaintiff's social functioning with adults and authority figures, Duguid reported:

> [Plaintiff's] ability to respect authority figures varies. At times, he's very respectful and polite. At other times, he's seemingly indifferent toward authority figures. He has had past incidents of acting disrespectfully toward Judge Buck, resulting in the judge sentencing [Plaintiff] to twice as much time in the Youth Home as planned. [Plaintiff] has had difficulties with insubordination toward teachers and administration in the school in the past. Lately, he's been feeling

agitated with authority figures, and he acts like he's invincible, with
no concern for consequences of his behavior.

(Tr. 404).

As for Plaintiff's ability to maintain employment, Duguid observed that Plaintiff "has historically had difficulty in previous summer jobs through WIA with lying, not attending to tasks, nor being where he's supposed to be, and insubordination." (Tr. 405).

Duguid concluded that Plaintiff "maintained psychiatric stability while he was under court supervision," but "[u]pon release from the court's jurisdiction, [Plaintiff] immediately resumed oppositional and defiant behavior." (Tr. 413). Duguid further observed that Plaintiff's "behavior is very difficult to manage in the home, even though his father provides appropriate rules and boundaries." (Tr. 413).

On October 24, 2007, Jessica Duguid reported that Plaintiff was experiencing "ongoing difficulties" at the Youth Home and was "currently in isolation." (Tr. 427). Following an October 30, 2007 examination, Dr. N.B. Gajare rated Plaintiff's GAF score as 40. (Tr. 417-18). Treatment notes dated November 1, 2007, indicate that Plaintiff "continues to struggle w[ith] rules" at the Allegan County Youth Home. (Tr. 423). Youth Home staff reported that Plaintiff was "lazy" and "essentially disengaged." (Tr. 423). Plaintiff reported that he "cannot effectively participate" due to the side effects of his new medications. (Tr. 423).

Treatment notes dated January 29, 2008, indicate that Plaintiff had recently been returned to the "Detention Center" because "he has not been attending school and doing his work." (Tr. 415).

On February 28, 2008, Jessica Duguid completed an evaluation of Plaintiff's performance in several domains of functioning. (Tr. 431-36). In the areas of moving about and

manipulating objects and health and physical well-being, Duguid reported that Plaintiff experiences "no limitation." (Tr. 434). With respect to Plaintiff's ability to care for himself, Duguid characterized Plaintiff's limitations as "marked." (Tr. 434). In the domain of acquiring and using information, Duguid reported that Plaintiff experiences "less than marked" impairment. (Tr. 433). In the domain of attending and completing tasks, Duguid characterized Plaintiff's limitations as "marked." (Tr. 433). With respect to interacting and relating to others, Duguid reported that Plaintiff experienced "extreme" limitations. (Tr. 433). With respect to this particular area of functioning, Duguid observed:

> [Plaintiff's] impairments interfere with his social relationships with family, peers and the general public. With family he has a problem of constant conflict because he makes poor choices and his father tries to protect him from those choices and their consequences. For example, [Plaintiff] will steal, run away from home and refuse to attend school at times. This produces conflict. With peers [Plaintiff] is easily swayed to perform illegal and dangerous activities. He will partake in the use of illegal drugs, steal and perform risky activities. With the general public [Plaintiff] does not abide by social norms. He will steal, get in fights, engage in unprotected sex, and encounter conflict with others.

> The root cause of [Plaintiff's] problems is his static encephalopthy. He has traits of Fetal Alcohol Syndrome which likely contribute to his ADD, ODD and bipolar features. On the outside [Plaintiff] appears perfectly normal. But his brain does not function normally. He has not succeeded in school, nor has he succeeded in alternative academic placements with more structure. At this point he hopes to obtain a GED. But his success in that venture will depend upon how much support he can receive.

> [Plaintiff] has tried working through different programs, without much success. Again, his impulsivity, conflict with authority figures and his easy distractibility interfere with his ability to perform work on a sustained basis. With close supervision he can perform basic work tasks. But the amount of supervision is excessive for work in the competitive work environment.

A recurring feature in [Plaintiff's] presentation has been substance abuse. His substance abuse, however, is not the cause of his static encephalopathy. It is a symptom of that condition. [Plaintiff] is currently attempting to maintain sobriety from all alcohol and illegal substances. Were he to do so, it would not change the underlying static encephalopathy. His impulsivity would remain and he would still require significant supervision to avoid socially undesirable activities like stealing, walking/running away from home, conflicting with authority figures and maintaining activities of daily living like other adolescents nearing adulthood.

(Tr. 433, 436).


## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

Federal law provides that an "individual under the age of 18" will be considered disabled if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). To determine whether a child satisfies this standard, the Commissioner must evaluate the claim pursuant to a three-step sequential process. 20 C.F.R. § 416.924.

In the first step, if the ALJ determines that the child is engaged in substantial gainful activity he cannot be found to be disabled. 20 C.F.R. § 416.924(b); *Elam v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003). If the child is not engaged in substantial gainful activity the analysis proceeds to step two, at which point the ALJ must determine whether the child has a severe impairment or combination of impairments. 20 C.F.R. § 416.924(c); *Elam*, 348 F.3d at 125. If the ALJ determines that the child suffers from a severe impairment, or combination of impairments, the analysis proceeds to step three, at which point the ALJ must determine whether the

impairment(s) "meet, medically equal, or functionally equal" one of the impairments identified in the Listing of Impairments. 20 C.F.R. § 416.924(d); *Elam*, 348 F.3d at 125.

## B. The ALJ's Decision

After noting that Plaintiff was not engaged in substantial gainful activity, the ALJ proceeded to the second step of the analysis, finding that Plaintiff suffered from the following severe impairments: (1) attention deficit hyperactivity disorder; (2) conduct disorder; (3) mood disorder; (4) bipolar disorder; and (5) static encephalopathy. (Tr. 20). At the third step of the analysis, the ALJ concluded that Plaintiff's impairments do not meet or medically equal any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 20). The ALJ further determined that Plaintiff's impairments do not functionally equal in severity any impairment identified in the Listing of Impairments. (Tr. 20-29).

To determine whether a child claimant suffers from an impairment which is the functional equivalent of a listed impairment, the ALJ must evaluate how the child functions in each of six domains of functioning described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(a)-(b). To be considered disabled the child's impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The six domains of functioning are:

     (i)      acquiring and using information,
     (ii)     attending and completing tasks,
     (iii)    interacting and relating with others,
     (iv)    moving about and manipulating objects,
     (v)     caring for yourself, and
     (vi)    health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

A "marked" limitation is defined as one which "interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). A claimant's "day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities." *Id.* An "extreme" limitation is defined as one which "interferes very seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). A claimant's "day-to-day functioning may be very seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities." The designation of "extreme" is reserved for "the worst limitations," but an "extreme limitation does not necessarily mean a total lack or loss of ability to function." *Id.*

The ALJ found that Plaintiff experienced less than marked limitation in the following areas:(a) attending and completing tasks, and (b) caring for himself. (Tr. 23-29). The ALJ found that Plaintiff experienced no limitation in the following areas: (a) acquiring and using information, (b) moving about and manipulating objects, and (c) health and physical well-being. (Tr. 23-29). Finally, the ALJ determined that Plaintiff experienced marked limitation in the domain of interacting and relating with others. (Tr. 23-29). Accordingly, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act.

The ALJ's decision suffers from two fatal shortcomings. First, the ALJ's rationale for discrediting the opinions expressed by Jessica Duguid is not supported by substantial evidence. Furthermore, the ALJ's findings concerning the degree of limitation Plaintiff experiences in the aforementioned domains of functioning is likewise not supported by substantial evidence.

a.      Jessica Duguid's Opinion

As previously noted, Jessica Duguid expressed the opinion that Plaintiff experienced "marked" limitations in the following domains of functioning: attending and completing tasks, and ability to care for himself.  Duguid also concluded that Plaintiff experienced "extreme" limitations in the domain of interacting and relating to others.  Adoption of either of these conclusions by the ALJ would have resulted in a finding that Plaintiff is disabled.  The ALJ obviously disregarded Duguid's opinion, giving it little (if any) weight.  Plaintiff asserts that because Duguid was his treating care provider the ALJ was obligated to afford her opinion controlling weight.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data."  *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*,

839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ offered the following reasons for discounting Jessica Duguid's[4] opinion. The ALJ first asserted that "[t]he evidence clearly demonstrates that while the claimant takes his medications, his symptoms are adequately controlled." (Tr. 23). The ALJ further stated that he was "not convinced that the claimant was disabled because every reasonable method of treatment has

---

[4] The ALJ did not refer to Duguid by name, but instead referred to Plaintiff's "therapist" and referenced Duguid's opinion that Plaintiff was disabled due to his limitations in the aforementioned domains of functioning. (Tr. 23). The Court interprets this as a clear reference to Jessica Duguid.

The Court further notes that Defendant, in an apparent attempt to justify the ALJ's faulty rationale for discrediting Jessica Duguid's opinion, suggests that Duguid does not qualify as a treating medical source. This argument is not well taken. The ALJ did not suggest that Duguid does not qualify as a treating source and, in fact, stated just the opposite. (Tr. 23). The Social Security regulations provide that a psychologist who has provided that claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant, qualifies as a treating source. *See* 20 C.F.R. § 416.902; *Winning v. Comm'r of Soc. Sec.*, - - - F.Supp.2d - - -, 2009 WL 3172879 at *9 (N.D. Ohio, Sept. 28, 2009). Jessica Duguid is identified as a psychologist in the medical record and she clearly provided Plaintiff with medical treatment and had an ongoing treatment relationship with Plaintiff.

failed, as reported by his therapist, but rather the evidence shows the claimant has failed to be compliant with his treatment." (Tr. 23). Aside from noting that Plaintiff on occasion failed to take his prescribed medication, the ALJ has not identified any other treatment with which Plaintiff was not compliant. Substantial evidence does not exist to support the ALJ's rationale for discounting Jessica Duguid's opinion.

The Court recognizes that there is evidence that Plaintiff's condition often worsened when he stopped taking his medication. However, the mere fact that Plaintiff's condition deteriorated in the absence of medication does not necessarily establish that his condition was ameliorated when he was medicated. In this respect, while the record contains evidence suggesting that Plaintiff often responded favorably to medication, the record clearly establishes that despite medication Plaintiff continued to exhibit destructive and anti-social behaviors. The record also clearly demonstrates that even when he was medicated, Plaintiff was unable to function outside the most restrictive and controlled environments. Moreover, there is ample evidence that Plaintiff's medication often worsened or exacerbated his condition.

In sum, the ALJ's rationale for discounting Jessica Duguid's opinion is not supported by substantial evidence and evinces a painful oversimplification of Plaintiff's impairments, the limitations resulting therefrom, and the efficacy of the various treatment strategies employed to assist Plaintiff.


b.      The ALJ's Domains of Functioning Findings

As noted above, the ALJ found that Plaintiff experienced less than marked limitation in the domains of attending and completing tasks, and caring for himself, and marked limitation in

the domain of interacting and relating with others. Plaintiff asserts that these determinations are not supported by substantial evidence. Specifically, Plaintiff asserts that he experiences "marked" limitation in the domains of attending and completing tasks, and caring for himself, and "extreme" limitation in the domain of interacting and relating with others. Before identifying the shortcomings of the ALJ's analysis, a brief discussion of the domains in question is appropriate.

The domain of caring for oneself refers to how well the child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). An adolescent (i.e., a child between the ages of 12-18) should feel more independent from others and be increasingly independent in all of his day-to-day activities. 20 C.F.R. § 416.926a(k)(2)(v). He should also begin to discover appropriate ways to express his feelings, both good and bad. *Id.*

The domain of attending and completing tasks refers to how well the child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h). An adolescent should be able to pay attention to increasingly longer presentations and discussions, maintain his concentration while reading textbooks, independently plan and complete long-range academic projects, organize materials and plan time to complete school assignments. 20 C.F.R. § 416.926a(h)(2)(v). An adolescent should also be able to maintain attention on a task for extended periods of time and not be unduly distracted by peers or unduly distracting to them in a school or work setting. *Id.*

The domain of interacting and relating with others refers to how well the child initiates and sustains emotional connections with others, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). An adolescent should be able to initiate and develop friendships with same-aged children, relate appropriately to other children and adults, and begin to be able to solve conflicts between himself and peers or family members or other adults. 20 C.F.R. § 416.926a(i)(2)(v). He should be able to express his feelings and follow social rules for interaction and conversation. *Id.*

In arriving at his conclusions regarding Plaintiff's level of impairment in these particular domains, the ALJ expressly relied on the opinions of Dr. William Schirado and Dr. Thomas Ippel. The ALJ's reliance on their opinions, however, is misplaced.

Dr. Schirado never examined Plaintiff, but instead merely reviewed the record (as it then existed) and rendered an opinion as to Plaintiff's limitations in the aforementioned domains of functioning. (Tr. 307-13). The Court first notes that Dr. Schirado expressed his opinions in December 2005. Thus, the doctor's opinions fail to take into account the wealth of evidence after that date concerning Plaintiff's impairments. Such, by itself, casts serious doubt as to the weight that Dr. Schirado's opinions should have been accorded. Moreover, a review of Dr. Schirado's report reveals that the specific findings articulated in his report are inconsistent with his conclusions as to Plaintiff's degree of functional limitation. Furthermore, Dr. Schirado failed to take into consideration Plaintiff's diagnosis of static encephalopathy, a disorder which the ALJ expressly found Plaintiff suffered. The failure by Dr. Schirado to consider that Plaintiff suffers from a degenerative brain disease cannot be described as harmless or insignificant.

Dr. Ippel testified at the administrative hearing as a medical expert. The doctor testified that with respect to the domain of interacting and relating with others, Plaintiff experienced "marked" limitations. (Tr. 466). When asked to identify what would justify a finding that Plaintiff suffered an "extreme" limitation in this domain, Dr. Ippel testified that he "would be looking for difficulties getting along with peers as well as authority." (Tr. 469). As the medical record detailed above makes abundantly clear, Plaintiff has a lengthy history of difficulty "getting along with peers as well as authority." Thus, Dr. Ippel's testimony in this regard appears to contradict his previously stated conclusion, which the ALJ adopted.

Dr. Ippel also testified that his opinions were based in part on his determination that Plaintiff's "getting into difficulty, violating the judge's orders and being sent to the youth home, is mostly a voluntary thing, something that he chooses to do." (Tr. 473). The doctor is correct that Plaintiff's conduct was voluntary in the sense that Plaintiff was not under hypnosis or otherwise "controlled by" another person or entity. However, the doctor's response merely begs the question that is at the heart of this matter, namely *why* Plaintiff chose to engage in the behaviors at issue and the extent to which Plaintiff's various impairments impacted his decision to engage in such behaviors. Dr. Ippel's failure to address these underlying issues casts serious doubt on the weight that should be afforded his observations.

Finally, when asked about Plaintiff's diagnosis of static encephalopathy and its impact on Plaintiff's "psychological status," Dr. Ippel testified that he has *never* had any contact or experience with static encephalopathy. (Tr. 470). The doctor further testified that Plaintiff's father possessed "much more knowledge" about the condition than did he. (Tr. 470). The purpose of questioning a medical *expert* at an administrative hearing is to elicit from the expert medical

knowledge and expertise beyond that possessed by lay people so as to obtain a more complete and accurate assessment of the claimant's impairments and the limitations resulting therefrom. Rather than provide expert testimony about Plaintiff's diagnosis of a brain injury, Dr. Ippel simply conceded that Plaintiff's father was more knowledgeable on the subject. In this respect, the Court notes that Plaintiff's father testified that if "left unsupervised, I have no doubt that [Plaintiff] will make, consistently make poor choices every time." (Tr. 475). This testimony is consistent with the opinion expressed by Jessica Duguid, who also apparently understands static encephalopathy to a much greater degree than the ALJ's alleged medical expert. Dr. Ippel's stated ignorance concerning the degenerative brain disease from which Plaintiff suffers cannot be described as harmless or insignificant.

The medical evidence detailed above, including but certainly not limited to Jessica Duguid's opinions, is in stark contrast to the opinions rendered by Drs. Schirado and Ippel. The Court recognizes that, generally speaking, the ALJ is entitled to weigh and resolve conflicting evidence. However, considering the serious deficiencies discussed above with the opinions expressed by Drs. Schirado and Ippel, as well as the more than substantial amount of medical evidence contradicting these doctors' opinions, the Court is compelled to conclude that the ALJ's determination as to Plaintiff's limitation in the three domains of functioning identified above is not supported by substantial evidence.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been

resolved and proof of disability is compelling). While the ALJ's decision fails to comply with the relevant legal standard, the Court finds that there does not exist compelling evidence that Plaintiff is disabled. The Commissioner's decision must, therefore, be reversed and this matter remanded for further factual findings, including but not necessarily limited to, proper assessment and impact of Plaintiff's static encephalopathy and proper consideration of the opinions expressed by Jessica Duguid.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision fails to comply with the relevant legal standard, and is not supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: February 1, 2010        /s/ Ellen S. Carmody
       ELLEN S. CARMODY
       United States Magistrate Judge